UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
NIKKI ELAINE LEWIS,                     )
                                        )
        Plaintiff,                      )
                                        )        Civil Action No.
        v.                              )        15-12223-FDS
                                        )
CAROLYN W. COLVIN, Commissioner,        )
Social Security Administration,         )
                                        )
        Defendant.                      )
_____ )

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND
DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**

SAYLOR, J.

        This is an appeal of a final decision of the Commissioner of the Social Security

Administration ("SSA") denying Social Security Disability Insurance and Supplemental Security

Income benefits.  Plaintiff Nikki Elaine Lewis appeals the Commissioner's denial of her request

for benefits on the ground that the decision was not supported by "substantial evidence" pursuant

to 42 U.S.C. § 405(g).  Specifically, plaintiff contends that (1) the Administrative Law Judge

("ALJ") ignored relevant medical evidence during the "Step Two" and RFC determination

components of the Five Step Evaluation Process and failed to consider evidence of her chronic

regional pain syndrome ("CRPS") and severe anemia in his analysis; (2) the ALJ erroneously

gave more weight to the opinions of non-examining medical consultants than those of the

treating physicians; and (3) the ALJ failed to follow SSA policy in evaluating the evidence of

plaintiff's CRPS.

        Pending before the Court are plaintiff's motion to reverse or remand the decision of the

Commissioner, and Commissioner's motion for an order affirming her decision.  For the reasons stated below, the decision of the Commissioner will be affirmed.

I.    **Background**

Nikki Elaine Lewis was born on November 28, 1974.  (R. at 62).  She was 34 years old on the alleged disability onset date of June 18, 2009.  (*Id*. at 47).  She is married and has five children, three of them minors living at home.  (*Id*. at 62-63).

Lewis earned her G.E.D. in 1993, and has training as a certified nursing assistant ("CNA") in crisis prevention and intervention.  (*Id*. at 317-18).  In the past she has worked as a CNA and as a customer service manager at Walmart.  (*Id*. at 324).  She last worked in 2009, when she was employed at a psychiatric unit caring for geriatric patients.  (*Id*. at 63).  She ultimately resigned from that job as she could not properly care for the patients.  (*Id*. at 64). After leaving her last job, Lewis looked for a position at various nursing homes, hoping to find clerical work, but was unsuccessful.  (*Id*. at 65).

At her hearing before the ALJ, Lewis reported being able to shop with the assistance of her children, drive short distances, watch television, use the computer, make medical appointments, and travel around her community.  (*Id*. at 40, 41).

A.    **Medical History**

On November 24, 2008, Lewis was seen by an emergency technician, Dr. Lawrence Hulefeld, for an injury to her right foot and hip.  (*Id*. at 620).  She was given pain medication and a note to stay out of work until cleared by orthopedics.  (*Id*.).  At that point, she had already been diagnosed with iron-deficient anemia and vitamin B12 deficiency, and was receiving iron infusions at a medical center.  *See, e.g.*, *id*. at 850-51, 871, 877, 1042.

In January 2010, Lewis visited her primary-care physician, Dr. Laura Beeghly, for a

"periodic health assessment." (*Id*. at 556). Her medical problems were listed as asthma, eczema, and migraine headaches, as well as both pernicious and iron deficiency anemia, for which she was receiving iron infusions. (*Id*. at 556-557). She told Dr. Beeghly that she was going to school to become an EMT. (*Id*. at 557).

In April 2010, Lewis "was moving furniture" when she slipped and fell down stairs, injuring her hand. (*Id*. at 443). X-rays of the wrist and hand were normal. (*Id*. at 442).

On July 14, 2010, Lewis told Dr. Beeghly that she had leg numbness and that she had been having falls daily for two years. (*Id*. at 440). Dr. Beeghly's examination did not reveal "significant enough findings . . . to explain daily falls," although she did find decreased vibratory senses in both legs and noted that she staggered unusually when attempting to walk on her toes. (*Id*. at 441). Dr. Beeghly referred Lewis to Dr. Andrew Leader-Cramer, a neurologist. (*Id*.).

On October 25, 2010, Dr. Leader-Cramer examined Lewis for pain in her legs and feet. (*Id*. at 471). Lewis complained of longstanding coldness in both feet with discoloration and cyanosis, as well as "stabbing pain in both feet" that had started a week previously but had since "abated considerably." (*Id*.). Dr. Leader-Cramer suggested neurological testing, a rheumatic evaluation, and a vascular assessment. (*Id*. at 472).

On November 8, 2010, Lewis underwent an arterial exercise test on her legs. (*Id*. at 580). The test "was terminated at 3 minutes due to dizziness." (*Id*.). The test results appeared to show significant peripheral vascular disease in a "mild to moderate claudication category." (*Id*.).[1]

On December 20, 2010, Lewis complained to Dr. Beeghly that she had been experiencing chest pain since early November, which was occurring with increasing frequency to the point that it had become a daily event. (*Id*. at 430). She had also recently experienced an episode of

---

[1] Claudication refers to limping or lameness.

syncope.  (*Id*.).[2]  Testing revealed low glucose and ferritin levels, though Dr. Beeghly opined that "anemia is not why [Lewis] fainted because [she was] not anemic."  (*Id*. at 427-28).

At an April 2011 "periodic health assessment," with a nurse practitioner, Lewis reported "falling [and] weakness in legs," which the nurse practitioner interpreted as "MS like" symptoms.  (*Id*. at 418).

On June 15, 2011, Lewis met with Dr. Beeghly for injuries due to falling.  (*Id*. at 408). She reported a two-year history of falls and swelling in both legs, which turned blue.  (*Id*.).  A stress test showed "poor exercise capacity," as Lewis experienced symptoms in her legs and stopped the test.  (*Id*.).  Dr. Beeghly recommended that Lewis consult with a rheumatologist.  (*Id*. at 409).

On August 5, 2011, Lewis first met with a rheumatologist, Dr. Robert Sands.  (*Id*. at 404).  She reported a "2-year history of constant swelling, falling twice per week, injuring herself not infrequently, though so far no fractured bones," as well as "chronic dizziness," swelling and discoloration of the legs, and pain about the knees and more recently the hips.  (*Id*.).  Dr. Sands observed a "somewhat tentative and delivered gait," and wrote, "in summary, the cause for her symptoms is not clear," noting a "quite atypical history of Raynaud's."  (*Id*. at 405-06).  He also noted that Lewis "has had a negative neurologic and laboratory evaluation largely," and "partial vascular flow tests for her lower extremities and further evaluation from that perspective with her doctors seems [like] a good idea."  (*Id*. at 406).

At a follow-up examination on September 19, 2011, Dr. Sands noted that there was "no clear indication of a rheumatic disease being present," and that Lewis's complaints of "diffuse pain and fatigue" led him to "wonder if she has fibromyalgia."  (*Id*. at 505).  Dr. Sands further

---

[2] Syncope is a short loss of consciousness and muscle strength, characterized by a fast onset, short duration, and spontaneous recovery.

noted that "[t]he cause for the falling is not fully clear - I wonder if foot drop is playing a role however." (*Id*.). He observed a "somewhat slow and deliberate gait," full range of motion of all joints without swelling or deformity, "diffuse trigger pt [point] tenderness present," and a normal neurological examination, except that the dorsiflexors of the right foot showed some weakness and "giving way." (*Id*. at 504). He recommended that Lewis obtain an ankle/foot orthotic device to help prevent falling and that she see an orthopedic. (*Id*. at 505, 507).

On September 16, 2011, Lewis met with Dr. Beeghly after an emergency-room visit for a seizure-like episode. (*Id*. at 509). Dr. Beeghly scheduled a follow-up appointment with Dr. Leader-Cramer and instructed Lewis not to drive until cleared by neurology. (*Id* at 509-10).

On September 23, 2011, Lewis saw Dr. Leader-Cramer for the follow-up examination. (*Id*. at 469). Dr. Leader-Cramer's impression was of a "[l]oss of consciousness. The etiology of [which] remains unclear." A CT scan of the brain was normal. (*Id*. at 470).

On December 23, 2011, Lewis was taken to the emergency room after a fall down stairs. (*Id*. at 569). At a follow-up appointment on December 27, 2011, Dr. Leader-Cramer noted no further episodes of loss of consciousness and doubted that her symptoms represented seizures. (*Id*. at 468). Lewis also mentioned feeling a "pop" in her head, but the feeling stopped after she discontinued her Cymbalta medication, which made her head feel "clearer." (*Id*. at 468, 494).

On February 17, 2012, Lewis met with Dr. Beeghly and reported that she continued to have falls and was "tired all the time," and that her iron infusions always made her feel sick. (*Id*. at 1016). Dr. Beeghly noted that recent MRI, EEG, TTE (ultrasound of the heart), and stress tests were normal. (*Id*.). She further noted that the etiology of the falls was unclear, and that neurological testing revealed the "opposite of what is expected for foot drop . . . not sure why she needs an AFO [ankle-foot orthotic] brace." (*Id*. at 1017).

On April 21, 2012, Dr. Sands saw Lewis in a follow-up examination for falling, foot

drop, fatigue, and "diffuse total body pain consistent with fibromyalgia without defined

rheumatic illness." (*Id*. at 1001).  Dr. Sands noted that "the number one problem for her is pain,"

noting that Lewis had rearranged her home furniture so as to allow herself to grab something

before she falls.  (*Id*.).  His impression was that "she has a very therapeutically challenging

situation - there is diffuse pain consistent with fibromyalgia, foot drop the etiology of which is

not clear to me, depression, financial and family stress that is very substantial.  All of these

combined have very adversely affected her quality of life, and she is feeling overwhelmed." (*Id*.

at 1002).  He recommended tai chi, water aerobics, and participating in a pain management

program.  (*Id*.).

On June 6, 2012, Lewis saw Pamela Caires, a nurse practitioner, after a fall down stairs

resulted in hand and shoulder pain.  (*Id*. at 992).

On July 30, 2012, Lewis met Dr. Beeghly for a follow-up examination.  (*Id*. at 984).  Dr.

Beeghly noted that Lewis has a history of CRPS, writing that "Dr. Meleger who saw her this past

spring feels she has an atypical version of [CRPS]." (Id.).[3]  Dr. Beeghly further noted that Lewis

"can sit for an [hour] or so and then she needs to stand up can walk 10 min[utes] or so around the

house. . . . [Lewis] [c]an also get dizzy at any time. [She] [f]eels she can lift 10 [pounds] 'unless

I'm dizzy.'" (*Id*.).  Dr. Beeghly found good range of motion of the spine, normal motor strength

in the bilateral upper extremities (no corresponding assessment for the lower extremities), an

ability to stand on toes and heels with ankle-foot orthotic brace in place on the right side, and an

inability to squat.  (*Id*.).

On August 13, 2012, Lewis was examined at an advanced neurology clinic by Dr.

---

[3] This seems to be the first mention of CRPS in the record.

Nagagopal Venna for "a complex gradually worsening but chronic problem of pain, spasms, weakness, and recurrent falls along with daily changes in skin color from bluish to purplish, affecting the right lower extremity and now beginning at the left lower limb." (*Id*. at 891).  On examination, Dr. Venna could not feel the dorsalis pedis, posterior tibial, popliteal, or femoral pulses.  (*Id*.).  He noted that "there is a component of complex regional pain syndrome as well, that is currently being treated with the gabapentin, which we agree with." (*Id*.).  Further testing was recommended.  (*Id*.).

On December 5, 2012, examining neurologist Dr. Tracey Cho reported an "essentially normal" examination, with "some give way weakness of the right foot and an antalgic gait." (*Id*. at 923).  She noted that Lewis was "quite tearful and defensive throughout the visit," which included pain descriptions that were "poorly characterized." (*Id*.).  Dr. Cho found no evidence of a permanent or progressive neurologic disease process, and instead "suspect[ed] that her symptoms are related to a fibromyalgia-like process, exacerbated by depression." (*Id*.).

On March 2, 2013, Lewis returned to Dr. Sands, who noted that Lewis reported diffuse pain consistent with myofascial pain disorder, with foot drop and frequent falls.  (*Id*. at 972).  His impression was of a "very challenging situation with chronic pain disorder, no evidence for rheumatic disease." (*Id*.).

On June 19, 2013, Lewis visited Dr. Beeghly and reported that "[s]he was in a grocery store and lifted a big container and felt a pop in her back.  No pain at that time but started when she got home.  It started hurting everywhere later in the day. . . .  The main pain was in her back and legs, the latter is her usual leg pain." (*Id*. at 964).  Dr. Beeghly noted that Lewis was doing range of motion exercises but reported that Lewis could not find any tapes for tai chi and had not yet looked for yoga tapes.  (*Id*. at 966).

On September 7, 2013, Lewis reported to Dr. Sands that her pain level was at least moderate and present every day, although she was able to shop with her children and prepare quick meals.  (*Id*. at 952).  Lewis had also been turned down for the RIDE transportation program for the handicapped.  (*Id*.).  When asked whether she had enrolled in a pain management program, she stated that she was too "busy with other issues," such as episodes of shortness of breath, and she had not checked whether her insurance would cover such a program. (*Id*.).  Dr. Sands's impression was of a severe chronic pain disorder with Raynaud's phenomenon.  (*Id*. at 953).

Lewis's medical records contain multiple notations that she suffers from iron and vitamin B12 deficiencies with pernicious anemia and iron deficient anemia due to her status post gastric bypass surgery.  (*Id*. at 404, 1016).  Dr. Sands and Dr. Beeghly both noted that she is often tired. (*Id*. at 503, 1016).  Her blood tests consistently showed low levels of ferritin and she periodically received iron infusions and vitamin B12 injections from 2009 to 2011.  *See, e.g.*, *id*. at 1035, 1050, 416, 435.  At the hearing before the ALJ, she testified to feeling "extremely exhausted," and suffering from "extreme fatigue."  (*Id*. at 74, 82).

### B.   Residual Functional Capacity ("RFC") Assessments

On October 10, 2011, state agency reviewing consultant Dr. Barbara Scolnick found that anemia was Lewis's only medically determinable impairment.  She opined that Lewis was physically capable of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with some limitations as to postural activities such as balancing and stooping.  (*Id*. at 107-10).

On July 30, 2012, Dr. Beeghly found that Lewis's diagnoses were atypical post-traumatic CRPS, "dizziness, recurrent falls, B12 def[iciency], vit[amin] D def[iciency]," with a history of gastric bypass, and that these impairments would cause her to be absent from work more than

four times per month.  (*Id*. at 883, 887).  Dr. Beeghly concluded that Lewis could sit for at least

six hours, but would need a ten-minute unscheduled break twice an hour to walk around, and that

she could occasionally lift objects less than ten pounds.  (*Id*. at 886).  Dr. Beeghly specified that

Lewis had had those symptoms and limitations since approximately 2006.  (*Id*.).

In January 2013, state agency reviewing consultant Dr. Theresa Kriston found Lewis to

have several medically determinable impairments, including anemia, fibromyalgia, and

peripheral neuropathy.  (*Id*. at 131).  However, she did not find Lewis's statements to be entirely

credible due to internal inconsistencies, in that Lewis claimed that she has difficulty walking yet

"reports that she is able to shop in stores . . . 'for maybe 1 to 1 ½ hours.'"  (*Id*. at 133).  She

determined that Lewis could lift twenty pounds occasionally and ten pounds frequently, stand

and/or walk for three hours and sit for about six hours in an eight-hour workday, and

occasionally climb ramps/stairs and balance, stoop, kneel, crouch, and crawl, but never climb

ladders, ropes, or scaffolds.  (*Id*. at 134).[4]  Dr. Kriston also noted that the RFC determinations of

Dr. Beeghly and Dr. Sands did not appear consistent with Lewis's examinations and relied too

much on her subjective reports of symptoms and limitations.  (*Id*. at 136).

On his March 18, 2013 RFC assessment, Dr. Sands found Lewis to have several

medically determinable impairments, including foot drop, severe myofascial pain, and falling.

(*Id*. at 944).  He concluded that Lewis could not sit or stand/walk for more than two hours in an

eight-hour workday, could not lift any amount of weight in a competitive work situation, did not

require any assistive device while engaging in occasional standing/walking, and would be absent

from work more than four times per month.  (*Id*. at 946, 948).  He also noted that Lewis would

need to walk around for five minutes every ten minutes in an eight-hour workday.  (*Id*. at 946).

---

[4] This recommendation is incompatible with the definition of "sedentary work," which involves "occasionally lifting or carrying" of "no more than 10 pounds."  20 C.F.R. §§ 404.1567(a), 416.967(a).

Dr. Sands ultimately determined that Lewis "cannot do any work, even sedentary, due to severe pain." (*Id*. at 948).

## II.    Procedural History

Lewis applied for Social Security Disability Insurance and Supplemental Security Income benefits in August 2011, alleging a disability onset date of June 18, 2009.  (R. at 36).  She alleged disability due to "neuropathy in both legs" and "blood deficiency."  (*Id*. at 102).

Her August 2011 application was initially denied on February 6, 2012, and upon reconsideration on January 3, 2013.  (*Id*. at 36).  On February 19, 2013, she filed a request for an oral hearing, which was held on November 5, 2013, where she and a vocational expert gave testimony.  (*Id*.).  The ALJ denied her claims in a written decision on January 6, 2014.  (*Id*. at 33).  On February 25, 2014, she filed a request for review by the SSA Appeals Council.  (*Id*. at 25).  On April 6, 2015, the Appeals Council denied her request for review.  (*Id*. at 1).

On June 5, 2015, Lewis filed the present action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    Analysis

### A.    Standard of Review

Under § 405(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence, and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion.  *Rodriguez v. Secretary of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Secretary of Health and Human Servs.*, 826 F.2d 136, 144

(1st Cir. 1987).  Moreover, "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ.  It does not fall on the reviewing Court."  *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001).  In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Secretary of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  Reversal is warranted only if the ALJ committed a legal or factual error in evaluating plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Commissioner of Soc. Sec.*, 114 Fed. Appx. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Secretary of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).

### B.     <u>Standard for Entitlement to Disability Benefits</u>

In order to qualify for disability benefits, a claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act.  The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be severe enough to prevent the claimant from performing not only her past work, but also any substantial gainful work existing in the national economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 401.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute.  20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

First, is the claimant currently employed? If [she] is, the claimant is automatically

considered not disabled.

Second, does the claimant have a 'severe impairment' . . . mean[ing] an impairment 'which significantly limits his or her mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, [she] is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in Appendix 1 [of the Social Security regulation]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . . If, however, [her] ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:

Fourth, does the claimant's impairment prevent [her] from performing work of the sort [she] has done in the past? If not, [she] is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent [her] from performing other work of the sort found in the economy? If so, [she] is disabled; if not, [she] is not disabled.

*Goodermote v. Secretary of Health and Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries.  *See* 42 U.S.C.

§ 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless [she]

furnishes such medical and other evidence of the existence thereof as the [ALJ] may require.").

At the fifth step of the analysis, the burden shifts to the Commissioner to show that the

claimant is capable of performing jobs available in the national economy.  *See Goodermote*, 690

F.2d at 7.  In making this determination, the ALJ must assess the claimant's RFC in combination

with vocational factors, including the claimant's age, education, and work experience.  20 C.F.R.

§ 404.1560(c).

### C.      The ALJ's Findings

In evaluating the evidence in this case, the ALJ conducted the five-part analysis called for

by the regulations.  *See* 20 CFR § 404.1520.  At Step One, the ALJ found that Lewis had not

engaged in substantial gainful activity since June 18, 2009, the alleged onset date of the

disability.  (R. at 38).  At Step Two, the ALJ determined that Lewis had only one severe

impairment, neuropathy, and one non-severe impairment, depressive disorder.  (*Id*. at 39).  That

finding omitted any mention of anemia, foot drop and recurrent falling, or CRPS.  (*Id*.).  At Step

Three, the ALJ determined that Lewis did not meet or equal any of the Listed Impairments found

in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*. at 40-41).

Prior to Step Four, the ALJ made findings as to Lewis's RFC.  (*Id*. at 41).  The ALJ

found that Lewis had the RFC to perform sedentary work, except that she was limited to

occasional balancing with an assistive device, stooping, crawling, crouching, and kneeling, as

well as certain environmental restrictions.  (*Id*.).  The ALJ noted that her medically determinable

impairments could reasonably be expected to cause her symptoms, but found that her statements

regarding the intensity, persistence, and limiting effects to be only partially credible.  (*Id*. at 45).

In coming to that decision, the ALJ gave significant weight to the opinion evidence of the two

non-examining state medical consultants, finding their opinions to be consistent with the overall

objective medical evidence in the record, and gave the opinions of her treating physicians little

weight.  (*Id*. at 46).

At Step Four, the ALJ found that Lewis could not perform any of her past relevant work.

(*Id*. at 46-47).  That decision was based partly on the opinion of the vocational expert, who

testified that due to her age, education, past work history, and RFC, Lewis was not able to

perform any of her past relevant work.  (*Id*. at 47).

At Step Five, however, the ALJ found Lewis capable of other "sedentary" work, based on

the vocational expert's testimony, and Lewis's age, education, work experience, and RFC, and

thus was not "disabled" under § 1614(a)(3)(A) of the Social Security Act.  (*Id*. at 47-48).

D.      **Lewis's Objections**

Lewis raises three objections to the ALJ's findings.  She contends that (1) the ALJ improperly evaluated her CRPS and anemia both during the Step Two and RFC determination processes, contrary to substantial evidence; (2) the ALJ failed to give appropriate weight to the opinions of her treating source physicians throughout the evaluation process; and (3) the ultimate finding was erroneous because the ALJ failed to follow, or even mention, SSA policy in evaluating plaintiff's CRPS.

1.      **The ALJ's Evaluation of CRPS and Anemia**

Lewis first contends that the ALJ erred by not finding that she had CRPS and anemia at Step Two of the Five Step Evaluation Process, and that the ALJ improperly omitted both impairments from RFC consideration as well.  (Pl. Memo at 10).  She maintains that a "review of the longitudinal medical record and the opinions of Dr. Beeghly and Dr. Sands show that [she] has the signs and symptoms of CRPS."  (*Id*. at 14).  She also contends that the medical record is replete with references to her anemia, something that both the treating physicians and non-examining consultants have found to be a severe impairment.  (*Id*.).  Lewis believes that this error compromised the accuracy of the ALJ's ultimate decision.

In terms of the Step Two analysis, any error is harmless because the ALJ found her to have a severe impairment in neuropathy, thus facilitating the evaluation process regardless of any finding as to CRPS or anemia.  "Any error at step two of the sequential analysis is harmless where the evaluation proceeds past step two and the [ALJ] considers all of the claimant's impairments at step four."  *Jones v. Colvin*, 2014 WL 575457, at \*12 (D. Mass. Feb. 10, 2014); *Hines v. Astrue*, 2012 WL 1394396, \*12-13 (D.N.H. Mar. 26, 2012) (citing cases); *see also Fernald v. Social Sec. Admin. Comm'r*, 2012 WL 1462036, at \*2 (D. Me. Apr. 19, 2012) (citing

cases) (holding that an error in describing a given impairment as non-severe at step 2 is

considered "'harmless,' unless the claimant can demonstrate that the error proved outcome

determinative in connection with the later assessment of [her RFC]."); 20 C.F.R.

§ 404.1545(a)(2).  The analysis therefore turns to whether the ALJ properly considered CRPS

and anemia during his RFC determination.

The RFC assesses what a claimant "can still do despite [her] limitations."  20 C.F.R.

§§ 404.1545(a), 416.945(a).  The claimant has the burden of providing evidence to establish how

her impairments limit her RFC.  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  The

ALJ has a duty to consider all medically determinable impairments, even those that are found to

be non-severe, and consider their limiting effects.  20 C.F.R. § 404.1545(2).  In addition, the ALJ

must evaluate "the intensity and persistence of [a claimant's] symptoms, such as pain, and

determin[e] the extent to which [the claimant's] symptoms limit [her] capacity for work . . . ."

20 C.F.R. § 404.1529(c).  Relevant factors may include the claimant's daily activities.  20 C.F.R.

§ 404.1529(c)(3)(I).  However, "[t]he hearing officer is not required to—nor could he

reasonably—discuss every piece of evidence in the record."  *Sousa v. Astrue*, 783 F. Supp. 2d

226, 234 (D. Mass. 2011); *see also Santiago v. Secretary of Health and Human Servs.*, 46 F.3d

1114 (1st Cir. 1995).  Finally, the question for this Court is not whether a different conclusion

would be reasonable, but whether substantial evidence supports the ALJ's decision.  *Robles v.*

*Barnhart*, 2005 WL 1773963, at *4 (D. Mass. 2005) ("If substantial evidence exists to support

the ALJ's determination, the Court must accept his findings as conclusive even if the record

arguably could justify a different conclusion.").

Here, the ALJ explicitly considered Lewis's CRPS in making his RFC determination.  (R.

at 46).  The ALJ specifically noted that Dr. Beeghly reported Lewis to have "atypical post

15

traumatic [CRPS]," but disfavored the diagnosis on the grounds that it was "inconsistent with the lack of objective findings on diagnostic studies and physical examinations, as well as her admitted abilities." (*Id*.).  The ALJ also noted that Dr. Sands diagnosed Lewis with having "foot drop and severe myofascial pain with stiffness and falls," but found most of Dr. Sands's RFC determination to be inconsistent with the record as well.  (*Id*.).  In addition, the ALJ's ultimate decision derivatively considered CRPS and anemia, in that he based his determination partially on Dr. Kriston's opinion, which in turn considered both Dr. Beeghly and Dr. Sands's RFC determinations.  (*Id*. at 133).  It is therefore incorrect to say that the ALJ failed to consider CRPS during his RFC determination.

Furthermore, Lewis did not fulfill her burden of providing evidence to show that she even has CRPS, let alone that it objectively limits her ability to work.  Her CRPS diagnosis is limited and scattered at best.  Dr. Beeghly, in his RFC assessment, found Lewis to have "atypical CRPS," though that was the first and only time he officially diagnosed her with CRPS.  (*Id*. at 883).  Dr. Sands, who provided the most recent RFC, did not mention CRPS; rather, he found Lewis had only "severe myofascial pain."  (*Id*. at 944).  And neither of the consultants found Lewis to have CRPS at all.  (*Id*. at 107, 131).  At the hearing before the ALJ, Lewis herself stated that her pain symptoms were "undiagnosed" and diagnosing her pain problem was proving very difficult.  (*Id*. at 60).  Lewis cannot contend that the ALJ failed to find her CRPS to be a medically determinable impairment when it is unclear even to most of the medical providers in the record that Lewis suffers from CRPS at all.

Lewis is correct that the ALJ does not refer to anemia in his opinion, despite evidence of anemia throughout the record.[5]  However, anemia was discussed in some detail at the hearing

---

[5] At the hearing before the ALJ, Lewis stated that she suffers from "severe anemia, of vitamin deficiency, a complex regional pain syndrome, foot drop, and an anxiety disorder."  (R. at 66).

before the ALJ.  (*Id*. at 66, 68, 82-84).  Lewis stated that her doctors believed that either the

vitamin B or vitamin D deficiency could be the cause of her fatigue and confusion, and possibly

nerve damage, though the nerve damage could also have been due to muscle deterioration.  (*Id*.

at 82).  She also stated that she is no longer taking iron infusions for her anemia due to bad

reactions with the transfusions.  (*Id*. at 81).  Those statements fail to show that Lewis's anemia is

a medically determinable impairment, or that it limits her ability to work.  Moreover, it is unclear

that fatigue or confusion are related to Lewis's alleged work limitations, such as the need to take

unscheduled breaks and miss four days of work per month.  Upon review, Lewis has not proved

that her anemia is the cause of her symptoms, which is perhaps the reason the ALJ decided that

anemia did not merit discussion.  However, because the ALJ is not required to discuss every

piece of evidence in the record, and because he was clearly aware of Lewis's anemia, the failure

to discuss anemia in his written decision—especially considering its tentative relation to her

alleged work limitations—is not so severe an error as to warrant a remand.  Because references

to Lewis's anemia are replete throughout the record, and the ALJ spoke with Lewis directly

about the subject during the hearing, it is reasonable to conclude that the ALJ considered anemia

as a medically determinable impairment that could affect Lewis's ability to work.

Accordingly, the ALJ acted within his discretion in deciding not to include CRPS or

anemia as a severe impairment at Step Two in the evaluation process.  The ALJ also properly

considered CRPS during his RFC determination, and his handling of the anemia issue does not

warrant reversal.

### 2.   Weight Given to Treating Source Opinions

Lewis next contends that the ALJ's RFC determination was not supported by substantial

evidence.  She contends specifically that the ALJ failed to give controlling weight to the opinions

of her treating physicians, Dr. Beeghly and Dr. Sands, and that the ALJ should have at least given those opinions more weight than the opinions of the non-examining consultants, Dr. Scolnick and Dr. Kriston.  (Pl. Memo at 15, 18).  She further contends that the ALJ should have followed the opinions of Dr. Beeghly and Dr. Sands that she "would be absent from work more than four times per month and would need frequent breaks while working," which, along with the vocational expert's testimony, should have led to a finding of disability at Step Five.  (*Id*. at 15-16).[6]  She also contends that Dr. Scolnick's opinion did not constitute substantial evidence because it was conditioned on the absence of medical evidence that was furnished at a later date in the case.  (*Id*. at 18).

An ALJ's determination of a claimant's RFC must be supported by substantial evidence. *Seavey*, 276 F.3d at 10.  Substantial evidence is defined as "more than a mere scintilla" of evidence, such that a reasonable mind could accept the evidence as providing "adequate support" for the decision.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Since bare medical findings are unintelligible to a lay person in terms of [RFC], the ALJ is not qualified to assess [a] claimant's [RFC] based on the bare medical record."  *Berrios Lopez v. Secretary of Health & Human Servs.*, 951 F.2d 427, 430 (1st Cir. 1991).  The ALJ must rely on the reports of physicians in the record to make his determination.  (*Id*.).  In making an RFC determination, the opinion of a treating source will be given controlling weight if "the treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass.

---

[6] When asked how missing at least four days of work and the need for unscheduled breaks would affect Lewis's job prospects, the vocational expert testified that "these limitations would preclude adjustment to other work."  (R. at 98).

2007); 20 C.F.R. § 404.1527(c)(2).  To be inconsistent, evidence need only "be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion."  SSR 96-2p, 1996 WL 374188, at *3. Nevertheless, "the law in this circuit does not require [an ALJ] to give greater weight to the opinions of treating physicians, as she is granted discretion to resolve any evidentiary conflicts of inconsistencies."  *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Secretary of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)).

When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include (1) the length of the treatment relationship; (2) whether the treating source provided evidence in support of the opinion; (3) whether the opinion is consistent with the record as a whole; and (4) whether the treating source is a specialist.  20 C.F.R. § 404.1527(c); *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996).  Opinions that a claimant is "disabled or unable to work" are legal conclusions "reserved to the Commissioner because they are administrative findings that are dispositive of a case."  20 C.F.R. § 404.1527(d)(1).  The hearing officer is required, however, to provide "good reasons" for deciding to give the treating source's opinion the weight he did and must state "specific reasons for the weight given to the treating source's medical opinion . . . and must be sufficiently specific to make [it] clear to any subsequent reviewers."  SSR 96-2p, 1996 WL 374188, at *5; *see also, e.g.*, *Shields v. Astrue*, 2011 WL 1233105, at *8 (D. Mass. Mar. 30, 2011) (Dein, M.J.) ("Because the [hearing officer] supported his rejection of the treating physician's opinions with express references to specific inconsistencies between the opinions and the record, [his] decision not to grant [the treating physician's] opinions significant probative weight was not improper.").

Here, the ALJ gave little weight to the RFC opinions of the treating physicians, and significant weight to those of the non-examining consultants.  (R. at 46).  Because the ALJ found the opinions of Dr. Beeghly and Dr. Sands concerning CRPS to be inconsistent with the record, he was not required to give their opinions controlling weight and could instead assign significant weight to Dr. Kriston's opinion as substantial evidence.  Although Lewis is correct in claiming that Dr. Scolnick's opinion is incomplete and should not be given controlling weight, it is unclear that the ALJ relied on Dr. Scolnick's opinion at all; he stated that he relied on the "[s]tate agency medical consultants" and decided to give them "significant weight."  (*Id*. at 46). Therefore, it does not appear that the ALJ gave Dr. Scolnick's opinion controlling weight, and he at least partially relied on Dr. Kriston's opinion as substantial evidence, which occurred after Dr. Beeghly's atypical CRPS diagnosis.  Moreover, and in any event, it is unclear whether CRPS is the cause of Lewis's alleged limitations.  Dr. Scolnick and Dr. Kriston gave Lewis essentially the same RFC determination, even though Dr. Kriston's determination came after Dr. Beeghly's CRPS diagnosis and Dr. Scolnick's came before.  Regardless, it would not be improper for the ALJ to assign weight to Dr. Scolnick's opinion, as long as the ALJ did not rely on that opinion solely for its lack of a CRPS finding, which does not seem to be the case.

Lewis also maintains that the ALJ was required to follow the restrictive recommendations of Dr. Beeghly and Dr. Sands concerning breaks and days off from work.  That is not the case. Opinions from treating sources "concerning the effect(s) of RSDS/CPRS on the individual's ability to function in a sustained matter . . . or in performing activities of daily living, are *important* in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC."  SSR 03-2p, 2003 WL 22399117, at *7 (emphasis added).  Also, "[i]nformation other than an individual's allegations and reports from the individual's treating

sources helps to assess an individual's ability to function on a day-to-day basis . . . ."  (*Id.*).  The ALJ, therefore, is not required to follow the recommendation of treating physicians.  Instead, those recommendations are simply tools used for evaluation.  The ALJ was aware of, and considered, many opinions:  he considered those of the treating physicians, the vocational expert's testimony that those limitations would preclude Lewis from obtaining any sort of job, and Dr. Kriston's recommendation, which was a more expansive RFC determination than the one the ALJ ultimately determined.  *See* R. at 98, 168.

Moreover, Lewis's history of CRPS is tentative at best.  Even one of her treating physicians, Dr. Sands, did not include CRPS in his RFC determination.  (*Id.* at 944).  Considering that CRPS is inherently difficult to diagnose, that there is disagreement in Lewis's record concerning CRPS, and that some of Lewis's admitted activities undermine the validity of her reported symptoms, the ALJ could reasonably determine that Dr. Beeghly's diagnosis and RFC recommendation were inconsistent with the medical record and do not merit controlling weight.  Nonetheless, the ALJ did fulfill his duty and accorded the opinions of Dr. Beeghly and Dr. Sands some weight, giving reasons for his decision.  (*Id.* at 46).  The ALJ provided multiple reasons for giving little weight to the opinions of Dr. Beeghly and Dr. Sands.  Specifically, the ALJ noted that a CRPS diagnosis lies outside of Dr. Beeghly's expertise; that Dr. Sands treated Lewis only for a brief period of time; that Lewis's diagnoses were based fairly heavily on subjective reports of pain; that there were no definitive medical tests that support a CRPS diagnosis; and that Lewis's admitted abilities are inconsistent with their opinions.  (*Id.* at 45-46).  Although his reasons for discounting the opinions are not as specific as they could have been, it is clear upon review that the ALJ did not commit reversible error.

Accordingly, the ALJ did not act improperly in deciding not to give controlling weight to

the opinions of Lewis's treating physicians, nor did he err in deciding to give those of the state

agency consultants significant weight, as the latter opinions were supported by substantial

evidence.

### 3.  Failure to Follow SSR 03-2p Guidelines

Lewis's third objection is to the ALJ's failure to follow established SSA policy in

evaluating CRPS.  *See* SSR 03-2p, 2003 WL 22399117.  At Step Two, the ALJ found only two

impairments; severe neuropathy and non-severe depression.  Lewis contends that she also

suffered from CRPS and there was sufficient evidence is the record to support that finding.  (Pl.

Memo at 11).  Lewis maintains that CRPS is a unique diagnosis; that a lack of evidence and

reports of pain mandate a finding of CRPS; and that both the ALJ and Dr. Kriston failed to

follow the policy guidelines for assessing CRPS provided in SSR 03–2p.  (*Id.* at 14, 18-19).

SSR 03-2p is a guideline meant to explain the policies of the SSA in developing and

evaluating claims for disability on the basis of CRPS.  SSR 03-2p, 2003 WL 22399117, at *1.

"RSDS/CPRS constitutes a medically determinable impairment when it is documented by

appropriate medical signs, symptoms, and laboratory findings" and "*can* be established in the

presence of persistent complaints of pain," along with one or more of specified clinically

documented signs, such as swelling, autonomic instability, or involuntary movements of the

affected region.  (*Id.* at 4 (emphasis added)).  It is not uncommon in CRPS cases to have

conflicting evidence in the record "due to the transitory nature of its objective findings and the

complicated diagnostic process involved."  (*Id.* at 5).

Because the ALJ determined that CRPS was not one of Lewis's medically determinable

impairments, this Court must determine only whether the ALJ erred in that finding—not whether

the ALJ correctly followed the rest of SSR 03-2p, which concerns the guidelines to follow once a

medically determinable impairment is established.  Lewis offers no support for her argument that the ALJ failed to consider SSR 03–2p at Step Two.  Instead, she simply asserts that the ALJ ignored the diagnosis and relied on the opinion of a consultant rather than on those of her treating physicians regarding her CRPS diagnosis.  (Pl. Memo at 11).  That argument is unavailing.  SSR 03-2p instructs the ALJ to follow normal agency procedure in evaluating disability claims, specifically SSR 96-2p, concerning treating source opinions, and SSR 96-7p, concerning credibility of an individual's statements.  SSR 03-2p, at *5, *7, *8.  As discussed above, the ALJ properly followed those procedures and ultimately decided not to give the opinions of Lewis's treating physicians controlling weight.  Lewis also contends that a "review of the longitudinal medical record . . . show[s] that [she] has the signs and symptoms of CRPS." (Pl. Memo at 14).  Although SSR 03-2p states that an ALJ "*can reliably determine* that RSDS/CRPS is present and constitutes a medically determinable impairment" in Lewis's situation, it clearly does not mandate that the ALJ do so.  SSR 03-2p, at *4 (emphasis added). The ALJ therefore did not improperly eliminate CRPS as a medically determinable impairment.

Even if the ALJ did err in not finding CRPS to be a medically determinable impairment, Lewis's claims still fails.  Lewis contends that it is impermissible for an ALJ to find that a claimant's statements "concerning the intensity, persistence, and limiting effects of her symptoms are not entirely credible."  (Pl. Memo at 14).  That contention is simply wrong, as "once the disorder has been established as a medically determinable impairment, the [ALJ] must evaluate the intensity, persistency, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  SSR 03-2p, at *6.  When the individual's statements about pain or other symptoms are not based on objective medical evidence, the ALJ "must make a finding on the credibility of the individual's

statements based on based on a consideration of the entire case record." (*Id*.).  That includes any

relevant evidence in the record.  (*Id*.).  "If the [ALJ] finds that pain or other symptoms cause a

limitation or restriction having more than a minimal effect on an individual's ability to perform

basic work activities, a 'severe' impairment must be found to exist." (*Id*.).

In evaluating Lewis's neuropathy, and her symptoms in general, the ALJ properly

evaluated the evidence in the record concerning the intensity, persistence, and limiting effects of

her symptoms.  The ALJ pointed to the fact that Lewis's "medical reports reflect that objective

diagnostic findings and physical exam findings have been unremarkable or were noted to be

within normal limits." (R. at 45).  The ALJ found that the record revealed "relatively infrequent"

trips to the doctor and that her treatment has been "essentially routine and/or conservative in

nature." (*Id*.).  There was also evidence to suggest that Lewis had not been entirely compliant

with treatment in that she chooses not to use a cane or a walker and did not attempt to try yoga or

tai chi as recommend by Dr. Sands.  (*Id*.).  Additionally, the ALJ noted that Lewis admitted to

certain abilities that are inconsistent with her treating physicians' RFC recommendations, such as

doing "household chores, preparing simple means, driving, shopping, watching television, and

using the computer." (*Id*.).  Those findings could reasonably lead to a determination that Lewis's

pain statements were not entirely credible, which in turn could lead to a determination that Lewis

is capable of sedentary work and is not limited to a position that would allow frequent

unscheduled breaks and four days off from work per month.

Lewis is also incorrect in her claim that Dr. Kriston failed to follow SSA policy in

making her RFC determination.  Lewis claims that Dr. Kriston was incorrect when she wrote that

Lewis's "etiology remains unclear in spite of [work up]," and that Dr. Kriston acted improperly

by deciding to give Dr. Beeghly and Dr. Sands's opinions little weight since they both relied

"heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." (Pl. Memo at 18).  Lewis seems to contend that because "subjective reports of pain are the primary evidence for diagnosing and evaluating CRPS," Dr. Kriston was not allowed to cite ambiguity and credibility statements of pain as the basis for deciding not to find a CRPS diagnosis.  (*Id*.).  That contention cannot stand.  Not only does it defy reason that subjective reports of pain alone are sufficient to mandate a finding of CRPS as a medically determinable impairment, but SSR 03-2p repeatedly states that statements of symptoms alone are not sufficient.  SSR 03-2p, at *3-4.  Lewis confuses the distinction between sufficient and necessary factors for finding CRPS to be a medically determinable impairment.

Accordingly, the ALJ and Dr. Kriston properly followed SSR 03-2p and did not err either in determining CRPS not to be a medically determinable impairment or in deciding not to give the opinions of Lewis's treating physicians regarding her CRPS diagnosis controlling weight.

## IV.   Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion to affirm the action of the Commissioner is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: July 26, 2016